# Commonwealth *against* The Commissioners of Monroe County.

2 WS 495
34 SC ¹227

The re-construction of a county bridge which has been swept away by a freshet, must be by the county commissioners, with the sanction of the Court of Quarter Sessions and the grand jury.

*It seems,* the county commissioners alone have no authority to erect or maintain bridges. The power to repair them, as well as to erect bridges over small creeks, rivulets, &c., is given to the supervisors; but bridges of a larger class, too expensive for a township, are to be erected and repaired by the county commissioners, with the sanction of the Court of Quarter Sessions, and the grand jury.

ERROR to the Common Pleas of *Monroe* county.

A rule was obtained in the court below upon the commissioners of Monroe county, to show cause why a mandamus should not issue, commanding and requiring them to proceed forthwith to the repairing and re-constructing of the county bridge over Smithfield or Brodhead's creek, at a place where the great road leading from Easton to Milford, crosses the same in Lower Smithfield township and county aforesaid.

This rule was founded on the petition and complaint and affidavit of D. Zimmerman and others to the Court of Common Pleas of the county of Monroe, representing that, at a Court of Quarter Sessions of the peace, held at Easton, in and for the county of Northampton, at April Sessions 1795, the court and grand jurors, together with the county commissioners of said county (after a report of viewers had for the purpose), concurred in the propriety of erecting a bridge at the expense of the county, across Smithfield (or Brodhead's) Creek, at the place where the great road leading from Easton to Milford crosses the same, in Lower Smith-

[Commonwealth v. The Commissioners of Monroe county.]

field township, in the then county of Northampton, now in the county of Monroe, the expense of erecting the same being greater than the township could reasonably bear, and the bridge being necessary for the public convenience. That shortly thereafter a bridge was erected at the place aforesaid, by the said county of Northampton, and again rebuilt or thoroughly repaired by the said county of Northampton, and maintained by the said county, until the county of Monroe was erected by the Act of the 1st of April 1836, and was maintained by the said county of Monroe from that time until the 8th day of January 1841: when, in consequence of the high water, the superstructure of said bridge, which was of wood, was swept away, and the southern abutment was principally destroyed. That the commissioners of the said county of Monroe have been applied to by several of the taxable inhabitants of the township of Smithfield, to repair and re-construct the said bridge for the convenience of the public travelling the said road. That the said bridge is essentially necessary for the public, as the water is deep, the creek often swelled, and the ford, at all times difficult, is frequently impassable. The said road is the main leading road from Easton to Milford, and much travelled. That Joseph Kemmerer and John Smith, two of the said commissioners of Monroe county, although thereto requested as aforesaid, have refused to proceed to repair and re-construct the said bridge, so as to make the same passable for the public, John C. Bush, the other commissioner, having expressed his willingness to proceed with the said repairs, but being overruled by his colleagues, as your petitioners have been informed and believe. The petitioners and complainants, therefore, showing to your honours that they are taxable inhabitants of said county of Monroe, and that the said bridge is a county bridge as aforesaid, pray that this court will issue their mandamus to the said commissioners, commanding and requiring them to proceed forthwith to the repairing and re-constructing the said bridge, so as to make the same passable and convenient for the citizens of the commonwealth and others passing on and along the said road."

John C. Bush, one of the county commissioners, returned for answer, that, as he was informed and believed the matters of fact set forth in the petition of the relators were true, and that he, believing that the commissioners of Monroe county were bound by law to repair and re-construct the bridge in question, had always been willing and desirous of so doing, but that his colleagues, Joseph Kemmerer and John Smith, being of a different opinion, he had been overruled in the matter.

The following return was made by Joseph Kemmerer and John Smith, two of the county commissioners:

"To the Honourable the Judges of the Court of Common Pleas of the county of Monroe: the subscribers, commissioners of the county of Monroe, for answer to the rule granted by the

[Commonwealth v. The Commissioners of Monroe county.]

court upon the petition of Daniel Zimmerman and others, inhabitants of the township of Smithfield, directing them to show cause why a writ of mandamus should not issue, commanding them to repair a bridge over Brodhead's or Smithfield creek, do say that, as regards the allegation in the said petition contained, that the said bridge was erected by authority of the Court of Quarter Sessions, the grand jury and county commissioners of Northampton, your respondents suppose and believe the same to be true, but have no knowledge upon the subject, and are not advised whether, after the erection of the county of Monroe, any obligation rested upon the said county of Monroe to repair, support, and maintain the same. And further, that your respondents are not advised as to the fact, whether the said bridge has been only so partially swept away, so as to cast upon them the obligation to repair the same, or whether the same has been so entirely destroyed as to make a new view necessary. That the superstructure of the said bridge has been entirely swept away, as well as the western abutment—that the eastern abutment is injured—that the foundation of the western abutment has been entirely destroyed, and a very large portion of the road or bank on which the western abutment of the said bridge rested, has been washed away to an extent of not less than 100 feet, as they believe, so that, if the said bridge were rebuilt, it would be inaccessible without building an addition or extension of that length, or laying out a road upon other ground. And your respondents are not advised whether it is their duty to erect the bridge as it stood before it was destroyed, or to erect also the aforesaid extension or addition. And your respondents are ignorant whether, under all the circumstances of the case, they are bound to repair or erect the said bridge, and if so, whether or not it is the duty of your respondents to construct the aforesaid extension beyond the former site, and they pray the direction of the court in this matter."

After argument, the Court (Jessup, President) delivered the following opinion, and discharged the rule:

This is an application for a mandamus upon the county commissioners, requiring them to erect a bridge over Smithfield creek, upon the site of the old bridge, which was swept off by the freshet in January last. There was left but one pier, the other pier and the whole superstructure having been carried away. There is doubt whether the remaining pier must not all be removed before the site can properly be again used for re-constructing a bridge. It appears by the record of the Quarter Sessions of Northampton county, that, upon application to that court, at April Sessions 1795, the sum of £175 was appropriated for building this bridge. It is alleged and not denied, that some time after it was first built, it was swept off and rebuilt by the county of Northampton; at what time, and under what particular circumstances it was so

[Commonwealth v. The Commissioners of Monroe County.]

rebuilt, does not appear, nor is it at all material. The relators claim that the county commissioners are bound at once, and without further warrant than is given by the preceding facts, to proceed to the erection of the bridge. Various decisions are reported at the bar as having been made in the adjoining and other counties which sustain this position; and if there had not been too clear legislative enactments to admit of that course, the court would most gladly have yielded their assent to the force of legal decisions, coming from so highly respectable sources. But the provisions of the statutes seem too clear to admit of such constructions, and to me it appears that those decisions must have been made without a close examination of the several Acts of Assembly, relating to the erection of public bridges, or were made prior to 1802.

The several Acts of Assembly which regulate this branch of public business, are as follows:

1. The *Act of* 1700, (1 *Dall. St. Laws* 19), which provides, " That bridges shall be built and *maintained* over all small creeks and rivulets, when the respective county courts shall see cause, on the King's road, ten feet broad, with rails on each side, which county courts with concurrence of the grand jury shall agree with, and appoint some person or persons to build such bridge in their respective counties, who shall be paid for the same out of the respective county stocks."

2. The *Act of* 15*th of August* 1732, (1 *Dall. St. Laws* 283), which provides, " That the grand juries, commissioners, and assessors, with concurrence of the Quarter Sessions, shall be sole judges of the place where any bridge shall be built and *maintained*, and the commissioners, &c., with concurrence of the justices, &c., shall agree with workmen for building, *repairing*, and *maintaining* any bridge or bridges ordered to be built or repaired as aforesaid."

These were the provisions under which this bridge was at first built, and probably rebuilt. It is difficult to conceive how the opinion, even under these Acts, should have prevailed, that the county commissioners, without the concurrence of the court, could repair and maintain bridges. It is true that, prior to the Act of 15th of August 1732, they claimed and exercised this right without the sanction of the court, and that Act, as the preamble recites, was passed for the very purpose of restraining them from the exercise of this power, except with the concurrence of the court.

3. The next provision in order of time is found in the *Act of* 11*th of April* 1799, *sec.* 24, (3 *Smith's Laws* 401), which, while it did not repeal the prior Acts, provided, " That when the inhabitants of any county shall be desirous to have a bridge erected or *repaired* on any public road, over any water, they shall apply by petition to the Judges of the Court of Quarter Sessions of the

[Commonwealth v. The Commissioners of Monroe County.]

proper county, stating the place and circumstances of the case, with the probable expense, and the said court shall give said petition in charge to the grand jury, who shall consider of the propriety of erecting or repairing the same; and if the Court and jury shall approve thereof, the court shall make an order on the commissioners, requiring them to cause the same to be erected or repaired in the manner prayed for, or in any other manner, to be directed by the said court and jury, and thereupon the said commissioners shall, as soon as conveniently may be done, carry the same order into effect."

This Act takes away all discretionary power from the county commissioners, as well in erecting as repairing bridges, and makes them the mere instruments of executing the orders of the court and grand juries. The Act of 15th of August 1732, restrained the exercise of an assumed and usurped authority, and made the concurrence of the courts necessary. This Act strips them of all power and control, except that of obeying the mandate of the court. It is then passing strange that while this law was in force, the opinion should have prevailed that county commissioners of their own motion could rebuild and repair bridges.

4. The next Act upon this subject, is the general Road Law, passed 4th of April 1802; (3 *Smith* 512). This Act contained a variety of new provisions, and repealed "all laws heretofore enacted for laying out, making, amending, and repairing of public or private roads or highways, or for the making or repairing of bridges." Until the passing of this Act, the erecting and maintaining of bridges was the business of the county exclusively. The supervisors of the public roads had nothing to do with bridges; none of the previous Acts of the legislature, so far as I have been able to discover, enjoined upon them any duties relating to bridges. This Act of 1802 introduced a most important change upon this subject; the 20th section of this Act requires the supervisors, "in making and repairing the public roads or highways, to make and *maintain* sufficient causeways of stone or timber on marshy or swampy grounds, *and also make and maintain sufficient bridges over all small creeks and rivulets,* and deep gullies, where the same shall be necessary for the ease and safety of travellers." Where the creek formed the division line between townships, the bridge was to be built and maintained at the joint expense of the two adjoining townships.

We find, then, in this section an entire change given to this important branch of public business, and the supervisors of the townships substituted for the county commissioners, in the construction and repairs of bridges over "*all small creeks and rivulets.*" This is the description of the stream to be bridged by the county, according to the Act of 1700, and the same peculiar words are preserved in the Act of 1802, with the addition of "*deep gullies.*" All prior Acts being repealed, it is manifest that

[Commonwealth v. The Commissioners of Monroe County.]

county commissioners, so far as we have progressed in this investigation, had nothing to do with building or repairing bridges.

But the 21st section of this Act prescribes the duties of the county commissioners in clear and unequivocal terms. It provides that where a river, creek, or rivulet, over which it is necessary to erect a bridge, crosses a public road or highway, and the erecting of such bridge requires more expense than it is reasonable that one township, or two adjoining townships, should bear, it shall be the duty of the justices of the Court of Quarter Sessions, and they are hereby enjoined and required, on the representation of the supervisor, or supervisors, or on the petition and at the request of a number of the inhabitants of the respective townships, to order a view in the same manner as in the case of laying out roads and highways; and if, on the report of the said view, it appears to the court, grand jury, and commissioners, that such a bridge is necessary, and would be too expensive for the township or townships to erect, it shall be entered on record, and it shall be the duty of the commissioners of the county to procure an estimate, as nearly as may be, of the money which will be necessary to erect such bridge; and the commissioners of the county shall provide the same out of the county taxes, and proceed forthwith to have such bridge *erected*, by contract or otherwise, as shall seem most expedient; and such bridge, when so erected, shall be inspected by six fit persons, appointed by the Court of Quarter Sessions, agreeably to whose report it shall be approved or disapproved by the court; and if approved, the money shall be paid agreeably to the contract, or damages in favour of the county awarded, according to the judgment of the court. This Act having provided that all bridges should be made and maintained by the townships, thus makes the county auxiliary to the townships in the building, only in case of the bridge being too expensive for the township; and as no provision is made for maintaining or repairing by the county, the expense of that plainly remains upon the township, under the general provisions.

Under this Act, then, the county commissioners have no power to erect bridges, except by the mode above pointed out, and they have nothing to do with repairs, *as such*.

5. The next provisions are found in the general Act of 13th of June 1836, in which the same regulations are prescribed to the supervisors and county commissioners, as in the Act of 6th of April 1802. No provisions are made for repairing or maintaining bridges by the county, nor any discretionary powers given to the county commissioners, relating to erecting or repairing bridges. The 35th section provides that when the viewers, grand jury, court, and commissioners, agree that the bridge is necessary, and would be too burdensome for the township, it shall be "entered on record as a county bridge." The 36th section provides that when the bridge is authorized and recorded as a county bridge,

the county commissioners shall procure the estimates, and provide the moneys in the county rates, and proceed to build the bridge.

This Act of 1836 is the only one now in force relating to this subject; and by several sections the most ample provisions are made for guarding the interests of the county, as well against any fraud by contractors, as against any improper conduct or neglect by the commissioners. It is plain, that if the position claimed by the relators be correct, all these responsibilities and safeguards are inoperative, and upon a subject of great moment to the interests of the county, and involving the expenditure of very large sums of money, the county commissioners are almost without control. Nearly all the important streams are already provided with bridges, built by the counties; and the rebuilding of them, when swept away, is almost the only bridge-building likely to be required of the county. The freshet of last winter swept away six county bridges in this county, and a large number in the adjoining county. Are the large sums required for restoring these bridges to be expended by the county commissioners without supervision, when if *one bridge only* is to be erected, viewers under oath are to inspect the work, and protect the public interests? Very clear provisions must be shown to warrant such a conclusion. There are other palpable reasons why the words " county bridge," employed in the Act, are not to be considered as requiring the rebuilding of a bridge without view; and one of them is suggested by the facts of this case. The law under which the bridge was built, is repealed without any saving clause, and we have in its stead a provision which only brings in the county to the aid of the township, when the township is, in the judgment of viewers, grand jury, court, and county commissioners, unable to build the bridge. This bridge was built in 1795. The whole county was then new and sparsely populated. Smithfield township is since filled up with population and wealth. What might have been an insupportable burthen to the few pioneers of the wilderness, may be an inconsiderable and trifling consideration with their wealthy sons. The sites of bridges are often, when first selected, injudiciously located; and when the bridge requires rebuilding, either from its decay or loss by freshet, it is found necessary to vary its position and change the roads leading to it. For this proceeding, there is provision in the Act; and although there is nothing in the Statute which authorizes a review of the site of a bridge once fixed, yet the fact that every proceeding to erect a county bridge is *de novo*, that the viewers fix the site and adjust the contiguous portions of the road, affords ample remedy for an original injudicious location. The question of varying would of course only be agitated when the bridge needed reviewing.

The point has long since been settled, that in all cases of the disbursement of moneys by county officers, there must be express

[Commonwealth v. The Commissioners of Monroe County.]

legislative enactment. No discretion as to objects or mode of expenditures is vested in the county commissioners. No trifling alteration can be made in the public buildings, without the sanction and direction of the grand jury or the court; and the legislature in their wisdom have deemed it important, that in the expenditure of the public moneys for erecting bridges, there should be not only the general control by the county auditors, but the special and particular control of a board of viewers, appointed by the court, and finally by the court itself. A fear of neglect and favouritism on the part of the commissioners, and of peculation and unfaithfulness on the part of the contractors, seems to have induced these strict enactments. Clear and express law alone could induce me to place the large sums, of necessity to be expended in rebuilding bridges, beyond the reach of their wise provisions. The argument raised from the inconvenience which would result from delays in procuring a view, and taking all the steps required by law for building the bridge, is answered by the reply that still greater inconvenience might result to the public from unchecked haste, and injudicious and wasteful prodigality in the expenditure of the public money; and if it be found to be inconvenient thus to delay, the legislature would be the proper body to whom to direct the argument.

I have been, by this examination, led to the following result:

1. At no time has any law authorized the making and maintaining of bridges by the county commissioners, except with concurrence and under supervision of the court.

2. That under the Act of 1836, the supervisors are bound to make and *maintain the bridges.*

3. That the county only erects bridges when the township is unable to do it, and in no case repairs bridges after they are erected.

4. That all prior laws having been repealed by the Act of 15th of April 1802, and the provisions of that Act being supplied and repealed by the Act of 1836, nothing can be done by county commissioners, except according to the provisions of this last mentioned Act.

The application of the relators for a mandamus upon the county commissioners, is therefore dismissed.

Errors assigned:

The court erred in declaring—

1. That at no time has any law authorized the making and maintaining of bridges by the county commissioners, except with the concurrence and under the supervision of the court.

2. That under the Act of 1836, the supervisors are bound to make and *maintain* the bridges.

3. That the county *only* erects bridges where the township is unable to do it, and in no case repairs bridges after they are erected.

4. That all prior laws having been repealed by the Act of 15th of April 1802, and the provisions of that Act being supplied and repealed by the Act of 1836, nothing can be done by the county commissioners, except according to the provisions of this last mentioned Act.

5. And in discharging the rule obtained by the relators, which they should have made absolute.

*Ihrie* and *Porter,* for plaintiffs in error, contended that the court below erred in refusing the mandamus, and that the county commissioners had power and were bound to repair all county bridges. The practice has uniformly been for the county to repair them; and the decision of Judge Rush many years ago was in favour of it. It is true the Act of 1799 requires that the Court of Quarter Sessions and grand jury shall agree in the repair of county bridges: but that Act was supplied by the Act of 1802, which contains no such provision, and the present Act of 13th of June 1836, is like that of 1802. No Act of Assembly authorizes the supervisors to repair county bridges—their power extends only over small bridges erected by themselves, not where the county has taken upon itself the erection of a bridge. The Act of 13th of June 1836, shows this construction to be the true one, for it contains an express provision for the building and maintaining a bridge by the respective supervisors, where a small creek is the boundary of two townships; where it is over a large stream, it is to be kept in repair by the county commissioners. When a bridge is once duly erected, it becomes a county bridge, and is county property. By the Act of 15th of April 1834, sec. 11, the county commissioners are to repair the buildings of the county; and by the same Act they are prohibited from being concerned in public works. By section 23, they are required to publish, among other things, the sums expended in the repairs of old or the erection of new bridges.

*Hepburn, contra.* This bridge was erected under the former Acts of 1700 and 1732. By them no erection or repair of a county bridge could take place unless by the court, grand jury, and county commissioners. The next Act, 11th of April 1799, expressly required the grand jury to decide on repairs of county bridges. The Act of 4th of April 1802, first brought in the supervisors; directing that they should make and maintain bridges over small creeks and rivulets; but beyond that it was to be referred to the court and grand jury, if more expensive than the township could bear. The Act of 1836 is the same on this head as that of 1802, except a new provision for bridges across streams dividing counties. This bridge is worse than gone, and it would require more money to repair it than to build a new one. No authority is given to county commissioners to take materials for

[Commonwealth v. The Commissioners of Monroe County.]

repairs, though by sections 28, 31, and 48, that power is given to supervisors and contractors.

The opinion of the Court was delivered by

SERGEANT, J.—A review of our legislation from the year 1700 to the year 1836, as presented in the opinion of the court below, shows clearly that the powers of the county commissioners, in respect to bridges, were intended in all cases to be checked and guarded by the concurrent approbation and authority of the court and grand jury of the county. Involving, as these structures do, the outlay of large sums of money, to be collected by taxation on the people, it was intended that the expenditure should not be hastily incurred or by the will of a single body, but should be carefully watched and deliberately approved of by the sanction of two other bodies, whose judgment should be exercised in respect to it. In no Act of Assembly whatever, is the authority given to the county commissioners alone to erect or maintain bridges. On the contrary, in the earliest Acts there is visible an evident design to prohibit the exercise of such authority as inexpedient. And if, notwithstanding, the practice has crept in, it has been obviously in disregard of the Acts of Assembly. The power to repair bridges is by the two latest Acts of 1802 and 1836, given to the supervisors, as well as to erect bridges of a minor class over small creeks and rivulets and deep gullies; but where the bridges are of a large class, costing considerable sums, and are more expensive than a township can bear, the sanction of the court and grand jury is required. The destruction of a bridge by a freshet, involves substantially another erection: the cost is often as great as an original erection, and may sometimes be enhanced beyond it, by the expense of removing the ruins. Even a new site may have to be chosen. Such seems to be the case here. It is not the case of a repair. The former bridge is gone to all intents and purposes, and another must be built. When a county bridge has been once legally built, such ordinary repairs as are necessary to preserve it fit for use, are to be made by the supervisors of the township, as in the case of roads. But when a visitation of floods or other disasters destroys the greater portion of its value, and in effect requires the expenditure of money to a large amount, beyond what the township ought in reason to defray, it may fairly be considered as an erection, and fall within the provisions of the 35th section of the Act of June 1836, and must be proceeded in in the mode there pointed out. We concur, therefore, in the opinion given by the court below.

Proceedings affirmed.